**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

THE FISHING RIGHTS
ALLIANCE, INC.,

     **Plaintiff,**

    **v.**                      **Case No. 8:09-CV-00916-T-30AEP**
                                     **Case No. 8:09-CV-01544-T-30AEP**
                                     **Case No. 8:09-CV-02265-T-30AEP**

THE NATIONAL MARINE
FISHERIES SERVICE,

     **Defendant.**

_____ /

**REPORT AND RECOMMENDATION**

     Before the Court are three pairs of substantially identical cross motions for partial

summary judgment filed in three cases[1] addressing the singular issue of whether the National

_____

     [1] There are currently three cases involving identical parties and the same initial issue of
whether the NMFS complied with 16 U.S.C. § 1881(g). These cases and their respective
cross motions for summary judgment are: Fishing Rights Alliance, Inc. v. National Marine
Fisheries Service, 8:09-CV-00916-T-30AEP (Dkt. No. 33, 37); Fishing Rights Alliance, Inc.
v. National Marine Fisheries Service, 8:09-CV-01544-T-30AEP (Dkt. No. 34, 38); and
Fishing Rights Alliance, Inc. v. National Marine Fisheries Service, 8:09-CV-02265-T-30-AEP
(Dkt. No. 24, 28). For the purposes of this Order, and unless otherwise specified, the Court
shall use the docket entry numbering and pagination in Fishing Rights Alliance, Inc. v.
National Marine Fisheries Service, 8:09-CV-00916-T-30AEP to cite to case filings such as the
Plaintiff's motion for partial summary judgment. Further, unless otherwise specified, all
citations to the administrative record shall refer to the administrative record provided in
Fishing Rights Alliance, Inc. v. National Marine Fisheries Service, 8:09-CV-00916-T-30AEP.
Lastly, unless otherwise specified, all legal analysis and conclusions of law relate to and are
binding on all three cases.

Marine Fisheries Service (the "NMFS") complied with 16 U.S.C. § 1881(g).  In each of these cases, the Fishing Rights Alliance, Inc. (the "Plaintiff") challenges the NMFS's ability to carry out certain regulatory measures pursuant to amendments to the Fishery Management Plan for each case's relevant fishery.[2]  The Plaintiff alleges that the regulatory measures under the relevant amendments are unsupported by reliable data on fishing effort and mortality and should be set aside.  Specifically, the Plaintiff alleges that the NMFS may not lawfully implement these amendments prior to instituting improvements to data collection procedures under the Marine Recreational Fishery Statistics Survey ("MRFSS"), which is used by the NMFS in forming regulatory measures.  (*See* Dkt. No. 2 at ¶¶ 11, 15, 37-38.)

In 2006, following a two-year independent review of the MRFSS, the National Research Council found that the effort and catch data produced by the MRFSS was potentially inaccurate due to inefficiencies, data gaps, and statistical biases.  As a result of the National Research Council's findings, in 2007, Congress enacted the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006, requiring the NMFS to "complete" a new program for improving the MRFSS and "implement" the improved MRFSS by January 1, 2009.  *See* 16 U.S.C. § 1881(g)(3).  Since the Plaintiff claims that the NMFS has yet to comply with the relevant

---

[2] In Fishing Rights Alliance, Inc. v. National Marine Fisheries Service, 8:09-CV-00916-T-30AEP, the Plaintiff challenges Amendment 30B to the Reef Fish Fishery Management Plan.  *See* 74 Fed. Reg. 17603 (Apr. 16, 2009).  In Fishing Rights Alliance, Inc. v. National Marine Fisheries Service, 8:09-CV-01544-T-30AEP, the Plaintiff challenges Amendment 16 to the Fishery Management Plan for the Snapper Grouper Fishery of the South Atlantic Region.  *See* 74 Fed. Reg. 30964 (June 29, 2009).  In Fishing Rights Alliance, Inc. v. National Marine Fisheries Service, 8:09-CV-02265-T-30-AEP, the Plaintiff challenges Amendment 30A to the Reef Fish Fishery Management Plan.  *See* 73 Fed. Reg. 38139 (July 3, 2008).

2

provisions of 16 U.S.C. § 1881(g), the Plaintiff requests that "[a]ny closures on or after January 1, 2009 predicated on MRFSS data," such as the regulatory measures under the amendments at issue, "should be enjoined until NMFS complies with its statutory obligations." (Dkt. No. 38 at 10.) Thus, the relevant question before the Court is whether the NMFS complied with the relevant provisions of 16 U.S.C. § 1881(g), and if not, what remedy must be imposed. For the reasons set forth below, the Court finds that the NMFS complied with the language of the relevant provisions of the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006, and therefore recommends that the Plaintiff's Motions for Partial Summary Judgment be denied, and the NMFS's Cross-Motions for Partial Summary Judgment be granted.

## I.  PROCEDURAL BACKGROUND

On May 14, 2010, the Court entered an Order directing that the parties file motions for summary judgment, pursuant to the parties' stipulated briefing schedule, on the initial core issue of whether the NMFS complied with 16 U.S.C. § 1881(g).[3]  (Dkt. No. 28.)  On August 6, 2010, the Plaintiff filed its Motion for Partial Summary Judgment.[4]  (Dkt. No. 33.)  On September 10, 2010, the NMFS filed its Combined Cross-Motion for Partial Summary Judgment and Opposition to Plaintiff's Motion for Partial Summary Judgment.  (Dkt. No. 37.)  On September 16, 2010, the

---

[3] In its May 14, 2010 Order, the Court denied a joint motion to consolidate the three cases (Dkt. No. 27) on the basis that, while the cases are substantially related and share a core issue, there are divergent issues in at least two of the cases.  (Dkt. No. 28.)

[4] The Court's May 14, 2010 Order (Dkt. No. 28) provided that the Plaintiff should file a motion for partial summary judgment, which the Plaintiff has incorrectly filed as its "Initial Brief as to the MRFSS Issue."  (Dkt. No. 33.)  For the purposes of this Order, the Court will construe the Plaintiff's "Initial Brief as to the MRFSS Issue" as its "Motion for Partial Summary Judgment."

Plaintiff filed its Reply Brief as to the MRFSS Issue.  (Dkt. No. 38.)  Lastly, on October 8, 2010,

the NMFS filed its Reply Memorandum in Support of Cross-Motion for Partial Summary

Judgment (DE # 37).  (Dkt. No. 39.)

## II.  FACTUAL BACKGROUND

**A.       Overview of § 1881(g) of the Magnuson Act**

Through the Fishery Conservation and Management Act (later renamed the Magnuson-

Stevens Fishery Conservation and Management Act), Congress delegated to the NMFS by and

through the Secretary of Commerce (the "Secretary") "broad authority to manage and conserve

coastal fisheries." *See generally* 16 U.S.C. § 1801 et seq. (1976) (hereafter as the "Magnuson

Act"); *see also Kramer v. Mosbacher*, 878 F.2d 134, 135 (4th Cir. 1989).  Congress enacted the

Magnuson Act to address, among other things, its finding that:

> Certain stocks of fish have declined to the point where their survival is
> threatened and other stocks of fish have been so substantially reduced in
> number that they could become similarly threatened as a consequence of (A)
> increased fishing pressure, (B) the inadequacy of fishery resource
> conservation and management practices and controls, or (C) direct and
> indirect habitat losses which have resulted in a diminished capacity to support
> existing fishing levels.

16 U.S.C. § 1801(a)(2).  In order to further the goal of protecting these threatened fisheries, the

Magnuson Act established eight regional fishery management councils and provided that the

management of fishery resources within each region shall be conducted pursuant to a fishery

management plan ("FMP") prepared by each council or councils for each fish stock within its

region.  16 U.S.C. § 1852.  Under the Magnuson Act, an FMP shall "contain the conservation and

management measures," which are "necessary and appropriate for the conservation and

management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery ...."  16 U.S.C. § 1853(1). The regulatory measures at issue in the three cases derive from the following FMP amendments: Amendment 30B under the FMP for the Reef Fish of the Gulf of Mexico (the "Reef Fish FMP"), implemented by the NMFS on April 16, 2009; Amendment 16 to the FMP for the Snapper Grouper Fishery of the South Atlantic Region (the "Snapper Grouper FMP"), implemented by the NMFS on June 29, 2009; and Amendment 30A to the Reef Fish FMP, implemented by the NMFS on July 8, 2008.

### 1.      The MRFSS and the NRC Report

Since 1979, the NMFS has relied on the MRFSS to obtain statistics about marine recreational fisheries for use in formulating an FMP for a given fishery.  (Supp. Admin. R. at 00016.)  The MRFSS has two major components: an onsite component, in which anglers are intercepted and interviewed on the water or at sites such as at marinas; and an offsite component, in which anglers are contacted and surveyed by telephone after their trips are completed.  (Supp. Admin. R. at 00016-17.)  Information obtained by onsite and offsite sampling is used by a variety of different fishery management groups, including the regional fishery management councils established under the Magnuson Act.  (Supp. Admin. R. at 00033.)  As concerns over the environmental impact of both recreational and commercial fishing grew, and the recreational fishing "footprint" expanded, the need for more accurate sampling programs and more precise marine recreational fishery statistics became apparent.  (Supp. Admin. R. at 00016.)  In turn, the MRFSS endured criticism over the nature and use of its sampling data.  (Supp. Admin. R. at 00017.)  For instance, the MRFSS was intended to be a national program, but not all coastal states

participated in it.  (Supp. Admin. R. at 00017.)  Some states implemented their own surveys of

recreational fish landings in place of the MRFSS, while other states utilized additional surveys

to complement the MRFSS.  (Supp. Admin. R. at 00017.)  Critics also questioned the quality of

the MRFSS data used in FMP formulation.  (Supp. Admin. R. at 00017.)

As a result of this criticism, in 2004, the NMFS requested the National Research Council

of the National Academy of Sciences (the "NRC") to conduct an independent, scientific review

of the MRFSS.  Specifically, the NMFS requested the NRC to:

- Assess existing surveys and their suitability for monitoring effort and catch in the shorebased, private boat, and for-hire boat recreational fisheries;
- Evaluate how well these methods were providing the quality of information required to support accurate stock assessments and responsible fisheries management decisions; and
- Recommend improvements to ensure more accurate and precise estimates of recreational effort and catch.

(Supp. Admin. R. at 00212.)  In April 2006, after a two-year review of the MRFSS, the NRC

published its *Review of Recreational Fisheries Survey Methods* (the "NRC Report"), making

several key findings and recommendations regarding the collection and use of recreational fishing

data under the MRFSS.  (Supp. Admin. R. at 00016-28.)

The NRC noted initially that "marine recreational fishing is a significant source of

fishing mortality for many marine species and that adequate scientific information on the nature

of that mortality in time and space is required for successful management of those species."

(Supp. Admin. R. at 00018.)  The NRC also noted that, compared to when the MRFSS was first

implemented in 1979, management decisions must now be made at finer spatial and temporal

scales to result in more effective regulation of fisheries.  (Supp. Admin. R. at 00019.)  Despite

the need for increased and more effective management oversight, the NRC Report found that the

6

MRFSS suffered from a lack of financial resources, technical and practical expertise, and uniformity in use among coastal states. (Supp. Admin. R. at 00019-20.) Further, it was noted that both the "telephone and access components of the current approach have serious flaws in design or implementation and use inadequate analysis methods that need to be addressed immediately." (Supp. Admin. R. at 00019-20.)

As a result of these findings, the NRC recommended that the MRFSS be "completely redesigned to improve its effectiveness and appropriateness of sampling and estimation procedures, its applicability to various kinds of management decisions, and its usefulness for social and economic analyses." (Supp. Admin. R. at 00020.) The NRC also recommended that the MRFSS program be given a firm deadline linked to sufficient program funding, but should nevertheless enjoy "ongoing technical evaluation and modification, as needed, to meet emerging management needs." (Supp. Admin. R. at 00020.) Specifically, the NRC noted that:

> Surveys designed for monitoring long-term status of populations have considerable inertia and are resistant to change. In part, this resistance is appropriate if the data provided by the surveys are to be consistent and useful over long periods. Major design changes can break the continuity of data and render them unusable for population monitoring unless the new and old surveys are run in parallel for some years during the change.

(Supp. Admin. R. at 00066.)

To overcome problems with uniformity and accuracy of effort and catch data using MRFSS onsite and offsite sampling, the NRC recommended that a comprehensive, universal sampling frame with national coverage be established. (Supp. Admin. R. at 00022.) The most effective way to achieve this goal, according to the NRC Report, is through a national registration of all saltwater anglers, or by accumulating new and existing state saltwater license contact information from all anglers using state and federal marine waters. (Supp. Admin. R. at 00023.)

7

The NRC Report noted that any gap in such a program, such as the allowance of exemptions for certain classes of anglers, would compromise both the offsite sampling frame and also the program's goal of achieving uniformity and accuracy.  (Supp. Admin. R. at 00023.)  Once a universal sampling frame is established, then future telephone surveys, as well as internet surveys and panel surveys, which contact individual anglers repeatedly over time, would become more useful in accumulating accurate catch and effort data.  (Supp. Admin. R. at 00023.)  The NRC also recommended that the onsite sampling frame for the MRFSS should be redesigned to reduce sample bias.[5]  (Supp. Admin. R. at 00023-24.)

In terms of statistical estimations based on sampling under the MRFSS, the NRC found that the "designs, sampling strategies, and collection methods of recreational fishing surveys do not provide adequate data for management and policy decisions," and "current estimators of error associated with various survey products are likely to be biased and too low."  (Supp. Admin. R. at 00024.)  Thus, the NRC recommended that the statistical and data-collection methodologies should be examined and verified so that potential biases can be properly evaluated.  (Supp. Admin. R. at 00025.)  Further, a "research group of statisticians should design new analyses based on current developments in sampling theory."  (Supp. Admin. R. at 00025.)  Lastly, the NRC determined that in order to achieve the goal of establishing a new and improved fishery survey program, a "permanent and independent research group should be established and funded to continuously evaluate the statistical design and adequacy of recreational fishery surveys and to guide necessary modifications or new initiatives."  (Supp. Admin. R. at 00027.)

---

[5] The NRC defines bias as the "deviation of the expected value (mean) of a statistical estimator from the quantity it estimates."  (Supp. Admin. R. at 00040.)

8

2.       The Legislative History of the § 1881(g) Amendments

On April 12, 2005, in response to growing criticisms of the Magnuson Act, the Senate

Committee on Commerce, Science, and Transportation held a listening session with national

environmental groups, discussing the potential to reform fishery management councils, the need

to end overfishing and rebuild stocks, and the growing problem of illegal, unreported and

unregulated fishing on the high seas.  *See* Sen. Rpt. 109-229 at 13 (Apr. 4, 2006).  Following

subsequent hearings on the matter, Senate Bill 2012 ("Sen. 2012"), entitled the

Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2005, was

introduced in the Senate on November 15, 2005.  *See* 152 Cong. Rec. S12850-51 (daily ed. Nov.

15, 2005).  Under Sen. 2012, §§ 1881(g)(3) and (4) of the Magnuson Act were to be amended as

follows:

> **(3)** DATA COLLECTION.-Within 24 months after the date of enactment of
> the Magnuson-Stevens Fishery conservation and Management
> Reauthorization Act of 2005, the Secretary shall establish a program to
> improve the quality and accuracy of information generated by the Marine
> Recreational Fishery Statistics Survey, with a goal of achieving acceptable
> accuracy and utility for each individual fishery. Unless the Secretary
> determines that alternate methods will achieve this goal more efficiently and
> effectively, the program shall, to the extent possible, include-
>> **(A)** an adequate number of dockside interviews to accurately estimate
>> recreational catch and effort;
>> **(B)** use of surveys that target anglers registered or licensed at the
>> State or Federal level to collect participation and effort data;
>> **(C)** collection and analysis of vessel trip report data from charter
>> fishing vessels; and
>> **(D)** development of a weather corrective factor that can be applied to
>> recreational catch and effort estimates.
> **(4)** REPORT.-Within 24 months after establishment of the program, the
> Secretary shall submit a report to Congress that describes the progress made
> toward achieving the goals and objectives of the program.

9

152 Cong. Rec. S6033 (daily ed. June 19, 2006); Sen. 2012, 109th Cong. (June 19, 2006).  On

April 4, 2006, the Senate Committee on Commerce, Science, and Transportation released a report

on Sen. 2012, noting that for the proposed § 1881(g) amendments, "[i]mproved fishing data

collection is imperative to the successful implementation of ... the Magnuson-Stevens Act." *See*

Sen. Rpt. 109-229 at 38 (Apr. 4, 2006).[6]  On June 19, 2006, the Senate passed Sen. 2012, with

the addition of Senate Amendment 4310, which notably inserted language referencing the NRC

Report, and established a deadline for the implementation of the improved MRFSS program as

follows:

> **(3)** DATA COLLECTION.—
>> **(A)** IMPROVEMENT OF THE MARINE RECREATIONAL FISHERY STATISTICS SURVEY.—Within 24 months after the date of enactment of the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006, the Secretary, in consultation with representatives of the recreational fishing industry and experts in statistics, technology, and other appropriate fields, shall establish a program to improve the quality and accuracy of information generated by the Marine Recreational Fishery Statistics Survey, with a goal of achieving acceptable accuracy and utility for each individual fishery.
>> **(B)** NRC REPORT RECOMMENDATIONS.—The program shall take into consideration and, to the maximum extent feasible, implement the recommendations of the National Research Council in its report Review of Recreational Fisheries Survey Methods (2006), including—
>>> **(i)** redesigning the Survey to improve the effectiveness and appropriateness of sampling and estimation procedures, its applicability to various kinds of management decisions, and its usefulness for social and economic analyses; and
>>> **(ii)** providing for ongoing technical evaluation and modification as needed to meet emerging management needs.

---

[6] Although the NRC Report was released in April 2006, there is no mention of the report's findings and/or recommendations in the April 4, 2006 Senate Report.

> > **(C)** METHODOLOGY.—Unless the Secretary determines that alternate methods will achieve this goal more efficiently and effectively, the program shall, to the extent possible, include—
> > > **(i)** an adequate number of dockside interviews to accurately estimate recreational catch and effort;
> > > **(ii)** use of surveys that target anglers registered or licensed at the State or Federal level to collect participation and effort data;
> > > **(iii)** collection and analysis of vessel trip report data from charter fishing vessels; and
> > > **(iv)** development of a weather corrective factor that can be applied to recreational catch and effort estimates.
> > **(D)** DEADLINE.—The Secretary shall complete the program under this paragraph and implement the improved Marine Recreational Fishery Statistics Survey not later than January 1, 2011.
> **(4)** REPORT.—Within 24 months after establishment of the program, the Secretary shall submit a report to Congress that describes the progress made toward achieving the goals and objectives of the program.

*See* Sen. Amend. 4310, 109th Cong. (June 19, 2006) (amendment to Sen. 2012); 152 Cong. Rec. S6074 (daily ed. June 19, 2006); *see generally* Sen. 2012, 109th Cong. (June 19, 2006). The bill's sponsor, Senator Ted Stevens, noted that:

> Improvements for data collection and better management are important enhancements to the overall effectiveness of the Magnuson-Stevens Act. The bill the Senate passed today authorizes a national cooperative research and management program, which would be implemented on a regional basis and conducted through partnerships between Federal and state managers, commercial and recreational fishing industry participants, and scientists. It provides a mechanism for improving data relating to recreational fisheries by establishing a new national program for the registration of marine recreational fishermen who fish in Federal waters.

152 Cong. Rec. S6049-50 (daily ed. June 19, 2006).

The House of Representatives proposed two different bills meant to reauthorize the Magnuson Act, both introduced by Representative Richard Pombo. The first bill, House Bill 5018 ("H.R. 5018"), was introduced on March 28, 2006. Section 4 of H.R. 5018 proposed changes to data collection in recreational fisheries as follows:

11

**(b)** Recreational Data Collection-

**(1)** ESTABLISHMENT OF PROGRAM- Within 24 months after the date of enactment of this Act, the Secretary of Commerce shall establish a program to improve the quality and accuracy of information generated by National Marine Fisheries Service recreational fishing data collection programs, with a goal achieving accurate, useful, and improved data for each individual fishery. The program shall include–

**(A)** an increased number of intercepts above current baselines established by the National Marine Fisheries Service to accurately estimate recreational catch and effort;

**(B)** use of surveys that target anglers registered at the State level to collect participation and effort data;

**(C)** collection and analysis of vessel trip report data from for-hire vessels including party, head, and charter fishing vessels;

**(D)** development of a weather corrective factor that can be applied to recreational catch and effort estimates;

**(E)** an independent committee composed of recreational fishermen, other stakeholders, academia, persons with expertise in stock assessments and survey design, and appropriate National Marine Fisheries Service personnel, to review data collection estimates and geographic and temporal issues, among other variables, related to intercepts, prior to the finalization of the catch estimates; and

**(F)** identification of deficiencies in recreational data collection (including with respect to fishing on private property, night-time fishing, and random digit dialing) and develop sampling methods to correct the deficiencies.

**(2)** PROHIBITION OF FEES- The Secretary shall not impose any new fees on recreational fishermen for the purposes of data collection.

**(3)** REPORT- The Secretary of Commerce shall report to the Congress within 18 months after the date of the enactment of this Act, on–

**(A)** the progress made in developing such a program;

**(B)** whether the program has resulted in significantly better data for management of recreational fishing, and if not, plans to correct problems in achieving that result; and

**(C)** actions to continue to make improvements in data collection.

H.R. 5018, Sec. 4, 109th Cong. (Mar. 28, 2006).  Unlike Sen. 2012, which called for a national registry of recreational anglers, H.R. 5018 offered financial incentives to states that encourage the collection of recreational fisheries data.  *Id.*  Notwithstanding the House's initial proposal, during May 3, 2006 committee hearings on H.R. 5018, the Assistant Administrator for Fisheries within the NMFS, William T. Hogarth, Ph.D., testified that H.R. 5018 should adopt an approach similar to that of Sen. 2012, mandating the establishment of a national registry as suggested by the NRC Report.  *See* H.R. Comm. on Resources, *Full Committee Legislative Hearing on H.R. 5018 and H.R. 1431*, 109th Cong. 3-4 (May 3, 2006) (testimony of Dr. William T. Hogarth) (available at http://naturalresources.house.gov/UploadedFiles/HogarthTestimony05.03.06.pdf).  Dr. Hogarth further stated that the NMFS "believes a comprehensive registration of anglers is essential for improving management of fisheries resources."  *Id.*

The second bill, House Bill 5946 ("H.R. 5946"), entitled the Stevens-Inouye International Fisheries Monitoring and Compliance Legacy Act of 2006, was introduced by Representative Pombo on July 27, 2006.  *See* H.R. 5946, 109th Cong. (July 27, 2006).  Similar to Sen. 2012 and H.R. 5018, H.R. 5946 aimed to promote improved monitoring of fisheries and compliance with fishery regulation by amending the Magnuson Act.  However, unlike Sen. 2012 and H.R. 5018, H.R. 5946 did not originally include language analogous to that of the other bills' data collection provisions.  Nevertheless, the House passed H.R. 5946 on September 27, 2006.  *See* H.R. 5946, 109th Cong. (Sept. 27, 2006).  On December 7, 2006, Senator Stevens proposed Senate Amendment 5224 to H.R. 5946, which, among other changes, proposed replacing the entire text of H.R. 5946 with a slightly modified version of Sen. 2012 and renaming H.R. 5946 the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006.  *See*

Sen. Amend. 5224, 109th Cong. (Dec. 7, 2006) (amendment to H.R. 5946).  Senate Amendment

5224 left the data collection provisions affecting §§ 1881(g)(3) and (4) of the Magnuson Act

substantially identical to the language contained in Sen. 2012, with two key exceptions: (1)

Senate Amendment 5224 included an additional methodology consideration for achieving the

goals of the program to improve the MRFSS, and (2) the deadline for the implementation of the

improved MRFSS was moved forward to January 1, 2009 from January 1, 2011.  *See Id*.  With

the Senate's adoption of Senate Amendment 5224, H.R. 5946 now included the pertinent data

collection provisions found under the current version of §§ 1881(g)(3) and (4) of the Magnuson

Act as follows:

> **(3)** Data collection
>> **(A)** Improvement of the marine recreational fishery statistics survey
>> Within 24 months after January 12, 2007, the Secretary, in
>> consultation with representatives of the recreational fishing industry
>> and experts in statistics, technology, and other appropriate fields,
>> shall establish a program to improve the quality and accuracy of
>> information generated by the Marine Recreational Fishery Statistics
>> Survey, with a goal of achieving acceptable accuracy and utility for
>> each individual fishery.
>> **(B)** NRC report recommendations
>> The program shall take into consideration and, to the extent feasible,
>> implement the recommendations of the National Research Council in
>> its report Review of Recreational Fisheries Survey Methods (2006),
>> including–
>>> **(i)** redesigning the Survey to improve the effectiveness and
>>> appropriateness of sampling and estimation procedures, its
>>> applicability to various kinds of management decisions, and
>>> its usefulness for social and economic analyses; and
>>> **(ii)** providing for ongoing technical evaluation and
>>> modification as needed to meet emerging management needs.
>> **(C)** Methodology
>> Unless the Secretary determines that alternate methods will achieve
>> this goal more efficiently and effectively, the program shall, to the
>> extent possible, include–
>>> **(i)** an adequate number of intercepts to accurately estimate
>>> recreational catch and effort;

**(ii)** use of surveys that target anglers registered or licensed at the State or Federal level to collect participation and effort data;

**(iii)** collection and analysis of vessel trip report data from charter fishing vessels;

**(iv)** development of a weather corrective factor that can be applied to recreational catch and effort estimates; and

**(v)** an independent committee composed of recreational fishermen, academics, persons with expertise in stock assessments and survey design, and appropriate personnel from the National Marine Fisheries Service to review the collection estimates, geographic, and other variables related to dockside intercepts and to identify deficiencies in recreational data collection, and possible correction measures.

***(D) Deadline***

***The Secretary shall complete the program under this paragraph and implement the improved Marine Recreational Fishery Statistics Survey not later than January 1, 2009.***

**(4)** Report

Within 24 months after establishment of the program, the Secretary shall submit a report to Congress that describes the progress made toward achieving the goals and objectives of the program.

*See* 16 U.S.C. §§ 1881(g)(3)-(4) (emphasis added).  The Senate passed H.R. 5946 on December 7, 2006.  152 Cong. Rec. S11543 (daily ed. Dec. 7, 2006).  On December 8, 2006[7], the House of Representatives agreed to the Senate amendments, passing H.R. 5946 and clearing the measure for the President.  *See* 152 Cong. Rec. H9206-9235 (daily ed. Dec. 8, 2006).  President Bush signed the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006 (hereafter as the "MSRA") into law on January 12, 2007.  *See* Pub. L. No. 109-479, 120 Stat. 3575 (2007).

---

[7] The passage of H.R. 5946 by the House of Representatives occurred in the early morning hours of December 9, 2006 for the House session beginning on December 8, 2006.

15

B.      **The MRIP**

Before the passage of the MSRA, but after the release of the NRC Report, the NMFS began developing an improved recreational fishing data collection program. From September 5-7, 2006, the NMFS convened a three-day workshop on recreational fishery statistics in Denver, Colorado. (Supp. Admin. R. at 00214.) Participants in the workshop included regional fishery managers, stock assessment scientists, and survey statisticians to examine recreational fishing informational needs. (Supp. Admin. R. at 00214.) As a result of the workshop, several recommendations were made to the NMFS, including: establishing a comprehensive registry of all saltwater anglers; improving spatial and temporal data resolution; implementing more timely delivery of data to management entities; and standardization of methodology among the states and regions. (Supp. Admin. R. at 00215.) Following the passage of the MSRA, the NMFS Executive Steering Committee organized three leadership teams to oversee the new program's development: the Operations Team, which oversees day-to-day development and implementation of survey design and data management improvements; the Angler Registry Team, which is responsible for the development of a federal registry of recreational saltwater anglers; and the Communications and Education Team, which carries out strategic communications to engage partners and constituents in the redesign process. (Supp. Admin. R. at 00216-17.) As part of its development of an improved MRFSS, the Operations Team assembled four work groups consisting of ten to twenty members from state natural resource agencies, marine fisheries commissions, regional fishery management councils, the NMFS, and recreational fishing interest groups. (Supp. Admin. R. at 00218.) In August 2007, the Operations Team hosted a workshop in St. Petersburg, Florida, where the work groups began developing and implementing proposals to address the

16

recommendations identified by the Operations Team.  (Supp. Admin. R. at 00218.)  The work groups' final project plans were submitted to the Operations Team by the end of October, 2007, and over the next several months, were reviewed and recommended for funding.  (Supp. Admin. R. at 00219.)

During the spring and summer of 2008, the NMFS organized a number of regional listening sessions.  (Supp. Admin. R. at 00215.)  Some key recommendations from those sessions included: avoiding a one-size-fits-all approach to data collection by recognizing the different needs of different regions and emulating existing best practices; increasing the frequency of data collection and reporting to ensure timely management decisions; increasing the number of species accounted for in the surveys; and accounting for issues such as night fishing, shore-based fishing, fishing from private access points, competitive fishing, and release mortality.  (Supp. Admin. R. at 00216.)

In October 2008, the NMFS released an implementation report (the "MRIP Implementation Plan"), outlining the steps towards replacing the MRFSS with the Marine Recreational Informational Program (the "MRIP"), which the NMFS describes as "an improved system of regional surveys that will replace existing marine recreational fishing data collection programs."  (Supp. Admin. R. at 00207.)  According to the MRIP Implementation Plan, the improvements under the MRIP "will be incrementally implemented beginning in January 2009 as alternative approaches are designed and tested and will continue until the new program is fully implemented."  (Supp. Admin. R. at 00207.)  Many of these improvements draw directly from recommendations made in the NRC Report.  For instance, in response to the NRC's recommendation that a comprehensive, universal sampling frame of saltwater anglers be

established, the MRIP Implementation Plan notes that the NMFS is "developing a Saltwater Angler Registry, with a final rule to be released on or about November 1, 2008." (Supp. Admin. R. at 00213.) Further, in response to the NRC's recommendation that statistical bias be reduced by ensuring estimation procedures are consistent with sample designs, the MRIP Implementation Plan proposes "reviewing and adjusting current sampling and estimation methodologies to ensure that procedures are consistent, statistically valid and unbiased." (Supp. Admin. R. at 00213.) In order to facilitate the success of the MRIP, the MRIP Implementation Plan proposes several long-term programs, including small-scale pilot testing of new sampling and estimation designs to effectively test and evaluate alternative survey approaches, phased implementation of new survey methods to accommodate regions that are ready sooner than others, and benchmarking new survey methods against old survey methods to allow side-by-side comparison. (Supp. Admin. R. at 00223-24.)

Pursuant to the Magnuson Act and the MRIP Implementation Plan, on December 30, 2008, the NMFS promulgated a final rule establishing a national saltwater angler registry (the "National Registry Rule"). *See* 50 C.F.R. §§ 600.1400-1417 (2009); 73 Fed. Reg. 79705, 79705-19 (Dec. 30, 2008). The National Registry Rule definitively established a national registry of recreational anglers, "intended to improve existing angling effort surveys in order to improve their efficiency, to reduce possible sources of bias and to improve confidence in survey results by anglers and fishery managers." 73 Fed. Reg. 79705, 79705 (Dec. 30, 2008). Under the National Registry Rule, all recreational anglers were required to register with the NMFS by January 1, 2010. 73 Fed. Reg. 79705, 79706 (Dec. 30, 2008). Beginning January 2009, when the National Registry Rule became effective, the NMFS "will exempt anglers from the federal registration rule

18

if they are licensed in states that have a system to provide complete information on their saltwater anglers to the national registry." (Supp. Admin. R. at 00354.)  In order for a state to qualify as exempt from federal licensing, it must meet certain data collection and state licensing program requirements pursuant to the regulations under the National Registry Rule.  *See* 50 C.F.R. §§ 600.1405, 1416, 1417 (2009).  Thus, the National Registry Rule provided non-exempt states, and in turn non-exempt anglers living in those states, approximately one year to comply with the exemption requirements or register with the national saltwater angler registry.  (Supp. Admin. R. at 00354.)

In January 2010, the NMFS released its MRIP Implementation Plan: 2009/2010 Update (Supp. Admin. R. at 00269-324), in which the NMFS noted initial improvements implemented under the MRIP that have addressed fundamental issues identified by the NRC Report, including "establishment of a Federal angler registry, assessing the potential for bias in current surveys, and developing data collection standards."  (Supp. Admin. R. at 00271.)

## C.        The Relevant FMP Amendments

Under the Magnuson Act, any FMP prepared by any council must contain conservation and management measures that are "necessary and appropriate for the conservation and management of the fishery ... and ... consistent with the national standards, the other provisions of this chapter, ... and any other applicable law."  *See* 16 U.S.C. §§ 1853(a)(1).  Based on this provision of the Magnuson Act, the Plaintiff alleges that the NMFS unlawfully promulgated certain Annual Catch Limits ("ACLs") and Accountability Measures ("AMs")[8] pursuant to the

---

[8] "Accountability measure means a management control implemented such that overfishing is prevented, where possible, and mitigated if it occurs."  *See* 73 Fed. Reg. 38143 (July 3, 2008).

19

following FMP amendments without first satisfying its statutory obligations to improve data collection under the MSRA.  (Dkt. No. 33 at 8-9; Dkt. No. 2 at ¶¶ 11, 15, 37-38.)

### 1.      Amendment 30B

On April 16, 2009, the NMFS published regulations implementing Amendment 30B to the Reef Fish FMP.  *See* 74 Fed. Reg. 17603 (Apr. 16, 2009).  Among other measures, Amendment 30B establishes a recreational grouper aggregate bag limit of four fish per day, including no more than two gag grouper and no more than two red grouper. *See id.* Amendment 30B also establishes a recreational closed season for all shallow water grouper from February 1 through March 31 of each year. *See id*.  Amendment 30B also authorizes the NMFS to close the gag or red grouper fisheries when recreational landings exceed established ACLs. *See id.*  Lastly, Amendment 30B imposes AMs under which the NMFS may reduce the length of the fishing season if catch levels exceed levels from the previous year.  *See id*.

### 2.      Amendment 16

On June 29, 2009, the NMFS published regulations implementing Amendment 16 to the Snapper Grouper FMP.  *See* 74 Fed. Reg. 30964 (June 29, 2009).  Among other measures, Amendment 16 targets overfishing of the gag and vermilion snapper by revising the definitions of maximum sustainable yield ("MSY") and optimum yield ("OY"), specifying total allowable catch ("TAC"), and establishing seasonal closures from January 1 through April 30 for certain species of snapper and grouper. *See id*.  Amendment 16 reduces the recreational bag limit from five to three grouper aggregate (including misty grouper, red grouper, scamp, tiger grouper, yellowedge grouper, yellowfin grouper, blueline tilefish, sand tilefish, coney, graysby, red hind

and rock hind) and reduces the bag limit from two to one gag or black grouper within the aggregate. *See id*.

    **3.**    **Amendment 30A and the October 22, 2009 Closing**

On July 3, 2008, the NMFS published regulations implementing Amendment 30A to the Reef Fish FMP "to end overfishing of greater amberjack ... and to rebuild [this stock] to substantial levels." *See* 73 Fed. Reg. 38139 (July 3, 2008). Amendment 30A institutes several AMs, including increasing the recreational minimum size limit for greater amberjack, reducing the greater amberjack bag limit to zero for captain and crew of a vessel operating as a charter vessel or headboat, and establishing an overall recreational quota of 1,368,000 pounds. *See Id*. at 38143. Amendment 30A also authorizes the NMFS to temporarily close the recreational greater amberjack fishery for the remainder of the fishing year should "recreational landings ... reach or are projected to reach the applicable quota ...." *Id*., at 38143.

On October 22, 2009, to prevent the fishery from exceeding its quota for the 2009 fishing year, the NMFS temporarily closed the recreational fishery for greater amberjack. *See* 74 Fed. Reg. 54489 (Oct. 22, 2009). In the closure announcement, the NMFS stated:

> Constraining harvest to the quota is crucial to meeting the legal requirements to prevent and end overfishing and rebuild greater amberjack in the Gulf of Mexico. On August 4, 2008, new fishing regulations were implemented by NMFS (73 FR 38139) to reduce the harvest and discard of greater amberjack in the Gulf reef fish fishery. Regulatory changes for recreational greater amberjack included implementing a quota of 1,368,000 lb (620,514 kg), round weight and accountability measures. Using reported landings for 2009, NMFS projects the 2009 recreational greater amberjack quota will be met on October 24, 2009. Therefore, in accordance with 50 CFR 622.43(a), NMFS is closing the recreational fishery for greater amberjack in the Gulf EEZ, effective 12:01 a.m. local time on October 24, 2009. During the closure, the bag and possession limit for greater amberjack in or from the Gulf EEZ is zero.

74 Fed. Reg. 54489 (Oct. 22, 2009).

### III.  STANDARD OF REVIEW

Under the Magnuson Act, actions taken by the NMFS under regulations implementing

an FMP are subject to limited judicial review as follows:

> (f) Judicial review
>> (1) Regulations promulgated by the Secretary under this chapter and actions described in paragraph (2) shall be subject to judicial review to the extent authorized by, and in accordance with, chapter 7 of Title 5, if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable; except that–
>>> (A) section 705 of such Title is not applicable, and
>>> (B) the appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of such Title.
>> (2) The actions referred to in paragraph (1) are actions that are taken by the Secretary under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing.

16 U.S.C. § 1855(f)(1); 5 U.S.C. § 706.  Thus, the following provisions of the Administrative

Procedure Act (the "APA") summarize the Court's standard of review for the NMFS's

compliance with the MSRA:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall–
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be–
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> ...
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

22

5 U.S.C. § 706. "A finding that a decision was arbitrary or capricious requires [the Court] to find no rational basis for the decision. Once [the Court] find[s] a rational connection between the evidence and the decision, [the Court] must defer to the agency's expertise." *Tackitt v. Prudential Ins. Co.*, 758 F.2d 1572, 1575 (11th Cir. 1985) (citations omitted); *see also Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009) ("The arbitrary and capricious standard is exceedingly deferential. [The Court is] not authorized to substitute [its] judgment for the agency's as long as its conclusions are rational." (quotations and citations omitted)). Whether the Court ultimately decides to "compel agency action unlawfully withheld," or "hold unlawful and set aside agency action," both remedies rely on the Court's determination of the initial issue of whether the NMFS complied with the relevant provisions of 16 U.S.C. § 1881(g).[9]

## IV. DISCUSSION

### A.      Compliance Under the MSRA

16 U.S.C. § 1881(g)(3)(D) requires that the NMFS "complete the program under this paragraph and implement the improved Marine Recreational Fishery Statistics Survey not later than January 1, 2009." *See* 16 U.S.C. § 1881(g)(3)(D). The Plaintiff argues that the NMFS has not complied with 16 U.S.C. § 1881(g) because the NMFS "knowingly failed to heed a Congressional deadline and should be enjoined from basing closures on data Congress expressly found was no longer useful." (Dkt. No. 33 at 6.) While it is unclear based upon the parties' motions whether or not the Plaintiff believes that the NMFS complied with the completion

---

[9] On April 21, 2010, the parties appeared before the Court telephonically for a status conference. During that hearing, the Plaintiff noted that, should the Court decide that the NMFS complied with 16 U.S.C. § 1881(g), its claims would likely fail.

element of § 1881(g)(3)(D), the Court will address both the completion and implementation elements of § 1881(g)(3)(D) individually.

### 1.  Completion of the Program

In determining whether the NMFS "complete[d] the program under this paragraph," the Court must determine what Congress meant by the "program," and whether the release of the MRIP Implementation Plan in October 2008 constituted the program's completion.  The MSRA states that the NMFS shall "establish a program to improve the quality and accuracy of information generated by the [MRFSS], with a goal of achieving acceptable accuracy and utility for each individual fishery."  16 U.S.C. § 1881(g)(3)(A).  The NMFS argues that since the language of the MSRA "plainly indicates its intent for a framework ... to be in place by January 1, 2009," the establishment of the MRIP through the MRIP Implementation Plan, published in October 2008, satisfies the MSRA's program completion requirement.  (Dkt. No. 37 at 17-18.) The Court agrees with the NMFS.

Based on the Court's reading of the plain language of § 1881(g)(3), the "program" is not the actual survey meant to replace the MRFSS, but rather the plan from which the new survey would be born.  *See United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir.1999) ("The starting point for all statutory interpretation is the language of the statute itself."); *see also* 16 U.S.C. § 1881(g).  Thus, by publishing the MRIP Implementation Plan, which set implementation goals for the improved survey, the NMFS satisfied the requirement that the program be completed by January 1, 2009.  Leading up to the release of the MRIP Implementation Plan, the NMFS spent over two years gathering information on how to best create a new data collection system.  (Supp. Admin. R. at 00213.)  These efforts culminated with the MRIP Implementation Plan, which

24

outlined the steps to "improve the quality and accuracy of information generated by the [MRFSS], with a goal of achieving acceptable accuracy and utility for each individual fishery," as required by the MSRA.  16 U.S.C. § 1881(g)(3)(A).

The NMFS's argument also draws support from other provisions of § 1881(g)(3).  For instance, under § 1881(g)(3)(B), Congress made sure that the program "take[s] into consideration and, to the extent feasible, implement[s] the recommendations of the [NRC Report] ...."  16 U.S.C. § 1881(g)(3)(B).  The MRIP Implementation Plan discusses a number of recommendations made in the NRC Report, including reducing potential bias, establishing a universal sampling frame of saltwater anglers, and achieving a greater degree of standardization among surveying. (Supp. Admin. R. at 00213.)  In response to these recommendations, the MRIP Implementation Plan outlines steps towards reaching the goals of the NRC Report, thus satisfying § 1881(g)(3)(B) of the MSRA.  (Supp. Admin. R. at 00213.)  The MSRA also directs that, "[u]nless the Secretary determines that alternate methods will achieve this goal more efficiently and effectively," the program shall incorporate certain methods for achieving Congress's goals, to include gathering adequate intercept data, using surveys that utilize federal and state angler registration data, collecting vessel trip report data, developing a weather corrective factor for survey analysis, and using independent committees to review survey progress.  *See* 16 U.S.C. § 1881(g)(3)(C).  The MRIP Implementation Plan complies with this section as well, following Congressional guidance in proposing data collection solutions.  The legislative history of the MSRA also indicates that the "program" was intended to be a "national cooperative research and management program," much like the MRIP Implementation Plan.  *See* 152 Cong. Rec. S6049-50

25

(daily ed. June 19, 2006).  Thus, the Court finds that the NMFS complied with the program completion element of § 1881(g)(3)(D).

### 2.      Implementation of the Improved MRFSS

Regarding the implementation element of § 1881(g)(3)(D), the Plaintiff plainly argues that the NMFS failed to heed Congress's mandate under the MSRA requiring the implementation of the improved survey by January 1, 2009.  (Dkt. No. 38 at 6.)  Specifically, the Plaintiff argues that "[b]y definition, a survey is not implemented unless it generates data that informs the calculation of fishing effort."  (Dkt. No. 38 at 9.)  The NMFS argues that not only is the Plaintiff's interpretation of the provisions of the MSRA incorrect, but complying with the Plaintiff's interpretation of the MSRA would be "unrealistic and impossible."  (Dkt. No. 37 at 19.)  In resolving these conflicting arguments, the Court must first address what Congress meant by the word "implement."

*Webster's II New Riverside University Dictionary* defines the verb "implement" as "**1.** To put into effect: CARRY OUT <*implement* the combat plan>."  *Webster's II New Riverside University Dictionary* 614 (Houghton Mifflin Company 1988).  Using this definition, the implementation element of § 1881(g)(3)(D) would require that, after the completion of a plan to modernize the data collection systems within recreational fisheries, the NMFS shall *put into effect* the improved survey system.  As such, the implementation of the improved survey would signal the *introduction* of the new data collection system, the MRIP, as described in the MRIP Implementation Plan.  After a review of the legislative history of the MSRA, the Court finds that this definition of "implement" is consistent with the intent of Congress and the spirit of the

26

MSRA. Thus, the next step for the Court is to determine if in fact the NMFS implemented the MRIP in accordance with this definition.[10]

The NMFS argues that once the MRIP Implementation Plan was completed in October 2008, the MRIP was put into effect, and thus the implementation element of § 1881(g)(3)(D) was satisfied. (Dkt. No. 37 at 12-13.) Logically, the implementation of a plan follows the completion of that plan. In that regard, the NMFS is not wrong in its assertion that the MRIP was implemented following its release of the MRIP Implementation Plan. Notwithstanding this argument, there is a more definitive action that represents the implementation of the MRIP: the adoption of the National Registry Rule on December 30, 2008. The MRIP Implementation Plan laid out the framework for transforming the MRFSS into an improved survey, the MRIP. Chief among the improvements stated in the NRC Report's recommendations, Congressional hearings, MRIP listening sessions, and the MRIP Implementation Plan was the establishment of a national saltwater angler registry, which these groups acknowledged would be necessary in the development of an improved survey. (Supp. Admin. R. at 00213-225.) The NRC recognized the inefficiency and potential bias caused by the MRFSS's offsite component surveying, which relied on random digit dialing of only those coastal households containing land-line telephones. (Supp. Admin. R. at 00022.) Thus, the NRC recommended that the "most effective way to achieve" a comprehensive, universal sampling frame with national coverage, "is through a national

---

[10] The parties do not disagree as to whether the MRIP constitutes the "improved Marine Recreational Fishery Statistics Survey" under the MSRA, and instead disagree as to whether the MRIP has been implemented. In its Motion for Partial Summary Judgment, the Plaintiff states that "[t]he improved survey – the Marine Recreational Information Program ('MRIP') – is not even implemented as of today." (Dkt. No. 33 at 1.) Further, the NMFS states in its Cross-Motion for Partial Summary Judgment that "in October 2008, NMFS implemented its MRFSS improvement program: the MRIP." (Dkt. No. 37 at 12-13.)

registration of all saltwater anglers or through new or existing state saltwater license programs that would allow no exemptions and that would provide appropriate contact information from anglers fishing in all marine waters, both state and federal." (Supp. Admin. R. at 00022-23.)  In terms of timing, the establishment of a national saltwater angler registry was slated to be one of the initial actions taken by the NMFS in carrying out the MRIP Implmentation Plan.  (Supp. Admin. R. at 00225.)  The MRIP Implementation Plan specified that "[e]ffective January 1, 2009, the systems will be in place to begin to issue federal registrations and to receive registrant data and to receive directories of registered anglers and for-hire vessels from states with license based exemptions." (Supp. Admin. R. at 00238.)  The NMFS's adoption of the National Registry Rule on December 30, 2008, two days before the January 1, 2009 deadline, signaled the implementation of the MRIP.  An implementation plan was made, and by adopting the National Registry Rule, the NMFS had begun *to carry out* that plan.  Having formally *put into effect* the MRIP, which called for the establishment of a national saltwater angler registry, the NMFS had complied with the implementation element of § 1881(g)(3)(D).[11]

Nevertheless, the Plaintiff argues that compliance with the MSRA has not been met since the "MRIP is in the design and testing phase and currently has zero utility ...." (Dkt. No. 38 at 4.)  This understanding of the MRIP is misguided, mostly due to the Plaintiff's misinterpretation of the word "implement" under the MSRA.  The MRIP, in accordance with the recommendations of the NRC, is a phase-based improvement of the existing MRFSS. (Supp.

---

[11]   The Court notes that the MSRA also requires the NMFS to create a federal, regionally based registry program for recreational anglers. *See* 16 U.S.C. § 1881(g)(1).  This requirement does not conflict with the Court's view that the NMFS's adoption of the National Registry Rule marked the implementation of the MRIP since the improvement of the MRFSS relied heavily on the establishment of such a registry.

Admin. R. at 00220, 00238, 00281-282.)  In the initial evaluation phase, current survey methods are reviewed and analyzed in order to improve the data collection system in recreational fisheries. (Supp. Admin. R. at 00281.)  This phase of the MRIP was conducted since the MRIP's conception in 2006, and was largely completed prior to January 1, 2009.[12]  (Supp. Admin. R. at 00254-258.)  The innovation phase of the MRIP involves development and testing of new survey methods via pilot projects and results-based comparison to current methods.  (Supp. Admin. R. at 00281.)  Lastly, "[i]n the final Activation phase, survey improvements will be implemented." (Supp. Admin. R. at 00281.)  Many of the projects under the innovation and activation phases were scheduled to be completed in 2009 and 2010.  In the case of the national saltwater angler registry, according to the Spring 2009 MRIP Project Update, the "[i]mplementation of state data transmission and national registration," a project in the activation phase of the MRIP, is an "ongoing" project, which began with the adoption of the National Registry Rule on December 30, 2008.  (Supp. Admin. R. at 00258.)

By January 1, 2009, the deadline for implementation of the improved survey, projects under all phases of the MRIP had been put into effect, many of which were already completed. (Supp. Admin. R. at 00254-258.)  Thus, when the Plaintiff suggests that the MRIP is "in the design and testing phase and currently has zero utility," the Plaintiff has incorrectly summarized

---

[12] According to the NMFS, the evaluation phase "began in 2006 and current results are driving the innovations being tested in phase 2."  (Supp. Admin. R. at 00254.)  The MRIP projects under the evaluation phase that had not been completed prior to January 1, 2009 largely involved "ongoing technical evaluation and modification, as needed, to meet emerging management needs," as recommended by the NRC Report.  (Supp. Admin. R. at 00020, 00254.)  For instance, a project to evaluate and improve data collection quality control called for, "[d]ocumenting existing data collection quality control programs to evaluate their effectiveness in limiting error introduced during data collection, processing, and estimation," with a report due in December 2009.  (Supp. Admin. R. at 00251.)

how the MRIP works and the progress that the NMFS has made thus far.  (Supp. Admin. R. at 00020, 00254.)  With the exception of "ongoing technical evaluation and modification [of the MRIP], as needed, to meet emerging management needs," the design of the MRIP was completed prior to January 1, 2009. (Supp. Admin. R. at 00020.)  However, as stated in the NRC Report and reiterated in the MRIP Implementation Plan, this ongoing improvement of the MRIP is paramount towards achieving maximum efficiency in surveying recreational fisheries, and necessarily includes the "testing phase" that the Plaintiff incorrectly claims has "zero utility."  (Dkt. No. 38 at 4; Supp. Admin. R. at 00281.)  Contrary to the Plaintiff's assertions, the MRIP is not a one-trick pony.  Instead, the Court agrees with the NMFS's description of the MRIP as a "collaborative, multi-institutional effort" to be "incrementally implemented beginning in January 2009 as alternative approaches are designed and tested ...."  (Supp. Admin. R. at 000212, 000207.) Further, the improved survey implementation deadline under § 1881(g)(3)(D) does not conflict with this characterization of the MRIP.  It is clear that Congress intended for the improved MRFSS to be put into effect by January 1, 2009.  The MRIP phased implementation of the MRIP meets this deadline.  Nowhere in the MSRA or its legislative history does Congress indicate its intent, as the Plaintiff argues, for the improved MRFSS to be completely finalized with all phases of the MRIP *fully* implemented by January 1, 2009.  It is unclear if such a result will ever be realized given the "ongoing improvements" to the MRIP.  Nevertheless, such a requirement would also demand that all of the mechanisms suggested in the NRC Report and needed to achieve this goal be completed and fully implemented by January 1, 2009.  The Court agrees with the NMFS that achieving the Plaintiff's interpretation of the MSRA in a two-year

time frame is "unrealistic," but more importantly, unnecessary in order to comply with the language of § 1881(g)(3)(D).

Lastly, the Plaintiff argues that "[t]he [MSRA] did not permit phase-in of the improved survey after the deadline," and that the "very NMFS employees who mismanaged MRFSS from 1979 to 2006 now oversee its overhaul and have dragged their feet, making a mockery of Congress." (Dkt. No. 38 at 9.)  The Plaintiff has not cited to any case law or to the legislative history of the MSRA or Magnuson Act to draw support for this claim.  In addition, § 1881(g)(4) requires that "[w]ithin 24 months after establishment of the program," the NMFS must submit a report to Congress describing the "progress made toward achieving the goals and objectives of the program."  16 U.S.C. § 1881(g)(4).  Thus, Congress ensured that it would have the opportunity to review the NMFS's progress two years after the implementation of the improved MRFSS, and may then decide whether additional legislative actions to further the goals of the Magnuson Act are necessary.  However, the Court will not detract from this statutory scheme merely because the Plaintiff prefers a different manner of implementation than that which Congress has permitted.  *See Norelus v. Denny's , Inc.*, 628 F.3d 1270, 1300-01 (11th Cir. 2010) ("Courts may not rewrite the language of a statute in the guise of interpreting it in order to further what they deem to be a better policy than the one Congress wrote into the statute.") (citing *Artuz v. Bennett*, 531 U.S. 4, 10 (2000) ("Whatever merits these and other policy arguments may have, it is not the province of this Court to rewrite the statute to accommodate them.")).

### 3.      Potential Ambiguity in the MSRA

While the Court finds that the NMFS complied with the language of the data collection provisions of the MSRA, any ambiguity in the statutory construction of the MSRA would

31

nevertheless favor the NMFS. *See Teper v. Miller*, 82 F.3d 989, 996 (11th Cir. 1996). The Supreme Court has indicated that, "When Congress, through express delegation or the introduction of an interpretive gap in the statutory structure, has delegated policy-making authority to an administrative agency, the extent of judicial review of the agency's policy determinations is limited." *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 696 (1991). Therefore, had ambiguity been found, the Court would "defer to the reasonable interpretation by the agency" so long as the interpretation is consistent with the purposes of the MSRA. *See Sarmiento Cisneros v. U.S. Atty. Gen.*, 381 F.3d 1277, 1280 (11th Cir. 2004) (citing *Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)); *Lazaro v. U.S. Dept. of Agr.*, 186 F.Supp.2d 1203, 1210 (M.D. Fla. 2001) ("The district court generally defers to an agency's interpretation of ambiguous statutes that are specifically directed to the agency's functions."). Since the purpose of the MSRA is to protect and rehabilitate threatened fisheries, the Court finds that the NMFS's actions are consistent with this purpose and, at the very least, constitute a reasonable interpretation of the relevant provisions of the MSRA. *Sarmiento Cisneros v. U.S. Atty. Gen.*, 381 F.3d 1277, 1280 (11th Cir. 2004) (citing *Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)).

**B.        The Plaintiff's Challenges to the Relevant Amendments**

Alternatively, even if the Court had found that the NMFS had not complied with the MSRA, the Plaintiff's proposed remedy, to "set aside" the relevant FMP amendments and enjoin any "closures on or after January 1, 2009 predicated on MRFSS data," is inappropriate where the NMFS's actions were neither arbitrary nor capricious. (Dkt. No. 38 at 10.) Pursuant to § 1851 of the Magnuson Act, "Any fishery management plan prepared, and any regulation promulgated

to implement any such plan ... shall be consistent with" certain national standards for fishery conservation and management.  *See* 16 U.S.C. § 1851(a).  National Standard 2 states that "Conservation and management measures shall be based upon the best scientific information available."  16 U.S.C. § 1851(a)(2).  Further, the NMFS shall "establish advisory guidelines (which shall not have the force and effect of law), based on the national standards, to assist in the development of fishery management plans."  16 U.S.C. § 1851(b).  In 1996, pursuant to § 1851 of the Magnuson Act, the NMFS adopted advisory guidelines as to FMP development under National Standard 2:

> FMPs must take into account the best scientific information available *at the time of preparation*. Between the initial drafting of an FMP and its submission for final review, new information often becomes available. This new information should be incorporated into the final FMP *where practicable*; but it is *unnecessary to start the FMP process over again*, unless the information indicates that drastic changes have occurred in the fishery that might require revision of the management objectives or measures.

50 C.F.R. § 600.315 (1996) (emphases added).  Thus, even if the Court had found that the NMFS had not complied with the MSRA, the Plaintiff's argument that the "appropriate remedy is to preclude implementation of any closures that are based on non-conforming data, that is, catch data from the MRFSS system," (Dkt. No. 33 at 10) is inappropriate where such a remedy conflicts with the intent of the Magnuson Act.  Considering the advisory guidelines under National Standard 2, which speak directly to the issue of how a fishery council shall proceed with developing FMPs when new sampling data may replace older sampling data, the Court finds that the NMFS's adoption of the relevant FMP amendments was neither "arbitrary and capricious" nor based on "a clear error of judgment."  *See Sierra Club v. Johnson*, 436 F.3d 1269, 1273-74 (11th Cir. 2006) ("Under the arbitrary and capricious standard, we must consider whether an

agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.") (citations and quotations omitted).  Instead, a review of the way in which these amendments were created shows that the NMFS had a permissible rationale for including pre-MRIP data, namely that MRIP data was not yet available during the creation of the relevant amendments.  *See Fishermen's Finest, Inc. v. Locke*, 593 F.3d 886 (9th Cir. 2010) (upholding a fishery council's FMP amendment based on outdated catch data where the council had a "permissible rationale" for the data's inclusion).

The adoption of Amendment 30B occurred as a result of the passage of MSRA in January of 2007.  *See* 73 Fed. Reg. 63932, 63933 (Oct. 28, 2008) ("The reauthorized Magnuson-Stevens Act as amended through January 12, 2007, requires the councils to establish ACLs for each stock or stock complex and AMs to ensure these ACLs are not exceeded. The actions proposed in Amendment 30B are intended to address these mandates ....").  While the final rule was published on April 16, 2009, work on the rule occurred over the previous two years, with the proposed rule published in November of 2008, and a request for public comments made in October of 2008.  *See* 74 Fed. Reg. 17603, 17603-04 (Apr. 16, 2009).  Further, Amendment 30B relied on the comparison of data collected over the course of nearly a decade.[13]  *See generally*

---

[13] The NMFS's development of Amendment 16 to the Snapper Grouper FMP and Amendment 30A to the Reef Fish FMP occurred in similar fashions.  In the case of Amendment 16, while the final rule was published on June 29, 2009, the proposed rule was published on February 6, 2009, and a notice of availability of Amendment 16 and request for public comments was published on December 24, 2008.  74 Fed. Reg. 30965 (July 29, 2009). Further, Amendment 16 was based on a 2006 stock assessment, with TAC levels for gag and vermilion snapper based upon comparisons to average landings from 2004-2006.  74 Fed. Reg. 6258 (Feb. 6, 2009).  In the case of Amendment 30A, while the final rule was published on July 3, 2008, seven months before the January 1, 2009 implementation deadline, the proposed rule was published on April 8, 2008, and a notice of availability of Amendment 30A and request for public comments was published on March 31, 2008.  73 Fed. Reg. 38139 (July

74 Fed. Reg. 17603 (Apr. 16, 2009).  Therefore, obtaining the results that the Plaintiff requests would require the NMFS to abandon the efforts made prior to 2009 in formulating the FMP amendment and disregard any data compiled using the MRFSS.  The NMFS would essentially have to start from scratch, using only data obtained from the improved survey system.  Not only is this result irrational, but it also flies in the face of the MSRA.  *See National Fisheries Institute, Inc. v. Mosbacher*, 732 F.Supp. 210, 220 (D. D.C. 1990) ("[O]ne of the Act's national standards requires that '[c]onservation and management measures shall be based upon the best scientific information *available*.' 16 U.S.C. § 1851(a)(2) (emphasis added)."); *see also* 50 C.F.R. § 600.315 (1996) ("[N]ew information should be incorporated into the final FMP where practicable; but it is unnecessary to start the FMP process over again ....").

A conversation between Representative Peter DeFazio and Representative Nick Rahall during house negotiations prior to the passage of the MSRA further suggests that Congress did not intend to disrupt a council's ongoing efforts to develop FMPs, even if that FMP would be passed after the enactment of the MSRA:

> Mr. DeFAZIO. I would first like to engage the ranking member in a colloquy. The bill requires the Pacific Council to develop a rationalization program within 24 months from date of enactment. The Pacific Council has been working on a comprehensive ground fisheries management program for more than 3 years and is on target to complete that process by 2008. As I understand the bill, the Pacific Council can continue the development of its groundfish management program without having to restart the process. Is that correct?
> Mr. RAHALL. If the gentleman would yield.
> Mr. DeFAZIO. I would yield to the gentleman.
> Mr. RAHALL. The gentleman from Oregon is entirely correct. It is my understanding that the bill would permit the Pacific Council process to continue. We recognize that the

---

3, 2008).  Similar to Amendment 16 to the Snapper Grouper FMP, Amendment 30A to the Reef Fish FMP was based on a 2006 stock assessment.  73 Fed. Reg. 16830 (Mar. 31, 2008).

> Pacific Council has made substantial progress and do not intend to disrupt their efforts to develop and implement an appropriate groundfish management program, consistent with this act.

152 Cong. Rec. H9233 (daily ed. Dec. 8, 2006).  Even though the Pacific Council FMP was developed prior to the passage of the MSRA, the above conversation lends support to the notion that Congress had not intended for FMP formulation to cease, even temporarily, while compliance with specific provisions of the MSRA were met.  *See National Fisheries Institute, Inc. v. Mosbacher*, 732 F.Supp. 210, 220 (D. D.C. 1990) ("[T]he Magnuson Act does not force the Secretary and Councils to sit idly by, powerless to conserve and manage a fishery resource, simply because they are somewhat uncertain about the accuracy of relevant information.").

The NMFS argues that a case involving similar facts, *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, in which the Eleventh Circuit rejected a plaintiff's similar remedy-based argument, should guide the Court in the instant case.  (Dkt. No. 37 at 19.)   In *Alabama-Tombigbee*, the Eleventh Circuit reviewed the U.S. Fish and Wildlife Service's (the "Service") regulation of Alabama sturgeon under the Endangered Species Act (the "ESA").  *See generally Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250 (11th Cir. 2007).  The ESA mandated that the Service designate the critical habitat of a species concurrently with its decision to list the species as threatened or endangered. *See* 16 U.S.C. § 1533(a)(3)(A).  In *Alabama-Tombigbee*, even though the Service listed the Alabama sturgeon as endangered under the ESA, it failed to designate the sturgeon's critical habitat.  *See Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1262-63 (11th Cir. 2007).  As a result, the plaintiffs requested that the court invalidate the listing rule due to the Service's failure to comply with the ESA's habitat designation requirement.  *Id*. at 1263.  The district court rejected the plaintiffs'

request and instead ordered the Service to complete the habitat designation within two years of the conclusion of the litigation. *Id*. The Eleventh Circuit affirmed the district court's decision, reasoning that the plaintiffs' requested relief would "defeat the Congressional intent" behind the ESA, to protect species even if determination of their critical habitats were delayed. *Id*. at 1269. The Eleventh Circuit compared the plaintiffs' requested relief to "cut[ting] the cords of a skydiver's main parachute to punish the jump master for failing to pack the fellow a reserve chute," further noting that "[a]ny beneficial effect that sanction might have on the jump master's future performance would come at too high a cost to the poor soul hurtling toward the earth at terminal velocity." *Id.* at 1271. The same could be said of the Plaintiff's requested relief in this case.

At its core, the Magnuson Act is an "Act to provide for the conservation and management of the fisheries ..." *See* Pub. L. No. 94-265, 90 Stat. 331 (1976); *see also* 16 U.S.C. § 1801(a)(2). In passing the MSRA, Congress advanced the goals of the Magnuson Act by promoting "improved monitoring and compliance for high seas fisheries ...." *See* Pub. L. No. 109-479, 120 Stat. 3575 (2007). In spite of the clearly articulated purpose of the Magnuson Act, the Plaintiff suggests that, as a result of the NMFS's alleged non-compliance with a specific provision of the MSRA, "[a]ny closures on or after January 1, 2009 predicated on MRFSS data should be enjoined until NMFS complies with its statutory obligations." (Dkt. No. 38 at 10.) This proposed remedy would not only inhibit the NMFS's "conservation and management of the fisheries," but may also result in unfettered overfishing, the exact threat that the Magnuson Act seeks to eliminate. Such a result would go against the goals of the Magnuson Act and the MSRA, and, regardless of the Court's finding as to compliance, would be wholly inappropriate.

37

Lastly, in formulating Amendment 30B and Amendment 16, the NMFS considered a "no action" alternative to its final rules, which would presumably achieve the same result as the Plaintiff's request to "set aside" these amendments. (Dkt. No. 38 at 10.)  Had the NMFS decided to adopt the "no action" alternative, regulatory measures for the grouper and snapper fisheries would have remained at their previous levels, with existing ACLs, AMs, OY levels, and TAC limits based on data from pre-MRIP surveying systems such as the MRFSS.  *See* 74 Fed. Reg. 17603, 17607-08 (Apr. 16, 2009); 74 Fed. Reg. 30965, 30971 (July 29, 2009).  For Amendment 30B, a "no action" alternative "would not provide specific protection to [the] gag so that overfishing of this stock would continue."  *See* 74 Fed. Reg. 17603, 17608 (Apr. 16, 2009).  In terms of setting gag and red grouper allocations, the "no action" alternative to Amendment 30B "would revert the recreational:commercial allocation to that of Amendment 1," which was adopted in August of 1989.  74 Fed. Reg. 17603, 17608 (Apr. 16, 2009).  For Amendment 16, a "no action alternative would not achieve the Council's objective of ending overfishing of vermilion snapper."  74 Fed. Reg. 30965, 30971 (July 29, 2009).  Further, OY quotas for vermilion snapper would revert to previous levels under Amendment 13C, which relied on data from surveys going back as far as 1994.  71 Fed. Reg. 55096 (Sep. 21, 2006).  The Court is not persuaded by the Plaintiff's argument, which seeks to enjoin the enforcement of FMP amendments based on data derived from flawed surveys from the 2000s in favor of reverting back to FMP amendments based on data derived from the very same flawed surveys from the 1980s and 1990s.

## V.  CONCLUSION

After due consideration, the undersigned recommends that the Plaintiff's Motions for Partial Summary Judgment ((Fishing Rights Alliance, Inc. v. National Marine Fisheries Service, 8:09-CV-00916-T-30AEP, Dkt. No. 33); (Fishing Rights Alliance, Inc. v. National Marine Fisheries Service, 8:09-CV-01544-T-30AEP, Dkt. No. 34); and (Fishing Rights Alliance, Inc. v. National Marine Fisheries Service, 8:09-CV-02265-T-30-AEP, Dkt. No. 24)) be **DENIED** and the NMFS's Combined Cross-Motions for Partial Summary Judgment ((Fishing Rights Alliance, Inc. v. National Marine Fisheries Service, 8:09-CV-00916-T-30AEP, Dkt. No. 37); (Fishing Rights Alliance, Inc. v. National Marine Fisheries Service, 8:09-CV-01544-T-30AEP, Dkt. No. 38); and (Fishing Rights Alliance, Inc. v. National Marine Fisheries Service, 8:09-CV-02265-T-30-AEP, Dkt. No. 28)) be **GRANTED**.

**IT IS SO REPORTED** at Tampa, Florida on this 15th day of July, 2011.

_____
ANTHONY E. PORCELLI
United States Magistrate Judge

**NOTICE TO PARTIES**

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date it is served on the parties shall bar an aggrieved party from a *de novo* determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)(C); Local Rule 6.02; *Nettles v. Wainwright,* 677 F.2d 404 (5th Cir. 1982) (*en banc*).

Copies furnished to:

Hon. James S. Moody, Jr.

Counsel of Record